Terry S. FISCHL, Plaintiff-Appellant,

v.

GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant-Appellee.

No. 81–3611.

United States Court of Appeals, Fifth Circuit.

June 27, 1983.

Rehearing Denied Aug. 31, 1983.

Elliot G. Snellings, New Orleans, La., for plaintiff-appellant.

David L. Campbell, New Orleans, La., for defendant-appellee.

Before RUBIN, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

Terry Fischl sued General Motors Acceptance Corporation (GMAC), alleging that its failure to furnish specific reasons for denying him credit, and to disclose that this denial was predicated in whole or part on information derived from a credit reporting

agency, violated the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 *et seq.*, Regulation B promulgated thereunder, 12 C.F.R. § 202, and the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* Following a bench trial, the district court entered judgment for GMAC. We reverse and remand.

### Factual and Procedural Background

On September 27, 1980, Fischl applied in writing to O.E. Harring, Inc., a New Orleans automobile dealership, for credit covering $12,000 of the $15,000 purchase price of a 1980 BMW automobile. A Harring salesman referred Fischl's credit application to GMAC, communicating the information by telephone. After transcribing this information on an application form, GMAC employees contacted Credit Bureau Services, a local credit reporting service, and obtained a consumer report on Fischl.

Both the application and the consumer report reflected that Fischl, a 27 year-old single homeowner, made mortgage payments of $564.80 per month. Although he held two sales jobs and earned a total monthly income of approximately $4,000, the credit report erroneously referred to one position as past employment. Credit references listed on the application were VISA, MasterCharge, Diner's Club and General Electric Credit Corporation. The credit report disclosed that Fischl had achieved an A–1 credit rating on current accounts with two area retailers, the New Orleans Public Service, First Homestead, and VISA or MasterCharge. An account in good standing with Sears, Roebuck and Company was mistakenly described in the report as a credit inquiry.

After reviewing the application and report, Robert Bell, GMAC's credit supervisor, determined that Fischl's credit background was deficient in terms of duration and extent; specifically, there were no sustained monthly payments of an amount comparable to that required to finance the purchase of the BMW.[1] Based on these factors, Bell decided that credit at the level requested should not be extended, a decision approved by Lester Robinson, Bell's immediate superior.

On October 3, 1980, Fischl received a form letter from GMAC advising that his application had been rejected and noting, as the reason therefor, that "credit references are insufficient." The portion of the form letter designed to disclose the creditor's use of information from outside sources was marked "disclosure inapplicable." That same day, Fischl secured a copy of his credit report from Credit Bureau Services which reflected GMAC's inquiry. In subsequent telephone conversations with Bell and Robinson, both of which he initiated, Fischl learned that GMAC had received a consumer report from a credit reporting service. During these conversations, more specific reasons for the denial of credit were advanced and the name and address of the credit bureau were given. Shortly thereafter, Fischl secured a $12,000 loan from an area bank at a lower rate of interest than that offered by GMAC.

### Equal Credit Opportunity Act

The district court found that GMAC's adverse determination letter adequately informed Fischl of the basis for rejection of his credit application and, because the reason assigned therein was similar to one proposed in the Federal Reserve Board's (Board) model checklist, 12 C.F.R. § 202.-9(b)(2), that the creditor was insulated from

---

1. Creditors utilize two types of evaluation systems in deciding whether to grant credit: the judgmental and the credit scoring systems. Judgmental scoring is a subjective process whereby the creditor examines an applicant's ability and willingness to repay. Such information as home ownership, income, length of employment and credit references are typically relied upon. The creditor evaluates the character and repayment capacity of the applicant in light of his credit history, and formulates a professional judgment whether to grant or deny credit. Taylor, Meeting the Equal Credit Opportunity Act's Specificity Requirement: Judgmental and Statistical Scoring Systems, 29 Buffalo L.Rev. 73 (1980). *See* 12 C.F.R. § 202.-2(t). Under GMAC's judgmental system of credit evaluation, payments on debt secured by real estate, such as Fischl's mortgage obligation, did not figure in the credit decision.

liability under 15 U.S.C. § 1691e(e). Fischl contends that the district court erred in holding that GMAC provided him with the specific reasons for credit denial mandated by 15 U.S.C. §§ 1691(b)(2) and (3) and Regulation B, 12 C.F.R. § 202.9. He argues that the reason cited in GMAC's adverse determination letter, "credit references are insufficient," does not afford notice of the actual grounds for the denial, to-wit, the brevity of his credit history and the excessiveness of the amount he wished to finance when measured against the size of his current credit obligations.

█ Originally enacted in 1974 to prohibit discrimination in credit transactions, the ECOA was amended in 1976 to require creditors to furnish written notice of the specific reasons for adverse action taken against a consumer. 15 U.S.C. §§ 1691(d)(2) and (3).[2] Verbal notice is appropriate only if the creditor processed less than 150 credit applications during the preceding calendar year. 15 U.S.C. § 1691(d)(5). Perhaps the most significant of the 1976 amendments to the ECOA, these provisions were designed to fulfill the twin goals of consumer protection and education. As explained in the Senate report accompanying the 1976 amendments to the ECOA, Congress viewed the strict notice requirement as:

> a strong and necessary adjunct to the antidiscrimination purpose of the legislation, for only if creditors know they must explain their decisions will they effectively be discouraged from discriminatory practices. Yet this requirement fulfills a broader need: rejected credit applicants will now be able to learn where and how their credit status is deficient and this information should have a pervasive and valuable educational benefit. Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change of employment, or their already over-extended financial situation. In those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake.

The term "adverse action" is defined in § 1691(d)(6) as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." According to the Board's interpretation of this provision:

> (c) *Adverse action.* (1) For the purposes of notification of action taken, statement of reasons for denial, and record retention, the term means:
>
> (i) A refusal to grant credit in substantially the amount or on substantially the terms requested by an applicant unless the creditor offers to grant credit other than in substantially the amount or on substantially the terms requested by the applicant and the applicant uses or expressly accepts the credit offered; or
>
> (ii) A termination of an account or an unfavorable change in the terms of an account that does not affect all or a substantial portion of a classification of a creditor's accounts; or
>
> (iii) A refusal to increase the amount of credit available to an applicant when the applicant requests an increase in accordance with procedures established by the creditor for the type of credit involved.
>
> 12 C.F.R. § 202.2(c).

---

2.  Under 15 U.S.C. §§ 1691(d)(1)–(3):

    (d)(1) Within thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

    (2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

    (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

    (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of a person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

    (3) A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

S.Rep. No. 94–589, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Admin. News, pp. 403, 406.[3]

Exercising the implementing authority conferred by Congress, 15 U.S.C. § 1691b, the Board substantially revised Regulation B to effectuate the 1976 amendments. Under § 202.9(a)(2)(i) of the revised regulation, a creditor electing to provide a statement of reasons for denial or termination of credit in accordance with § 1691(d)(2)(A) must apprise the applicant in writing of the specific reasons for its adverse action. Section 202.9(b)(2) reiterates the specificity requirement set forth in § 1691(d)(3), dictates the inclusion of the "principal" reasons for adverse action, and advises creditors that completion of the model form contained therein assures compliance with § 202.-9(a)(2)(i). In its most recent interpretation of § 202.9 of Regulation B, effective April 1, 1983, the Board opined that:

> as a general principle the provisions of Regulation B [relating to disclosure of reasons for adverse action] apply equally to both judgmental and credit scoring systems of credit evaluation. The reasons for adverse action disclosed under § 202.9(a)(2) and (b)(2) must relate to factors actually scored or considered by the creditor. The creditor must disclose the specific reason or reasons for adverse action.

12 C.F.R. § 202.901(a). With respect to the proper use of the sample form outlined in § 202.9(b)(2), the Board emphasized:

> The sample form is illustrative and may not be appropriate for all creditors. It was designed to disclose those factors which creditors most commonly consider. Some of the reasons listed on the form could be misleading when compared to the factors actually scored. In such cases, it is improper to complete the form by simply checking the closest identifia-

ble factor listed. For example, a creditor that considers only bank references (and disregards finance company references altogether) should disclose "insufficient bank references" (not "insufficient credit references"). Similarly, a creditor that considers bank references and other credit references as separate factors should treat the two factors separately in disclosing reasons. The creditor should either add those other factors to the form or check "other" and include the appropriate explanation. In providing reasons for adverse action, creditors need not describe how or why a factor adversely affected an applicant. For example, the notice may say "length of residence" rather than "too short a period of residence."

12 C.F.R. § 202.901(f).

■ After considering the notice transmitted in light of the congressional language and purpose of § 1691(d), together with the Board's rational interpretation thereof, *see Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Whitfield v. Termplan, Inc.,* 651 F.2d 383 (5th Cir.1981), we find that GMAC's perfunctory reliance on the Board's sample checklist was manifestly inappropriate. While it resembles the category of "insufficient credit references" deemed acceptable by the Board, § 202.-9(b)(2), the reason for refusal of credit noted by GMAC, "credit references are insufficient," arguably communicates a different meaning. The Board's statement connotes quantitative inadequacy; that of GMAC implies some qualitative deficiency in Fischl's credit status. GMAC's statement does not signal the nature of that deficiency and, since the name and address of the credit bureau was not supplied, did not provide the mandated opportunity for the applicant to correct erroneous information.

---

**3.** Although the "starting point [in any case involving statutory construction] must be the language employed by Congress," *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979), we may examine the relevant legislative history of a particular statute in order to ensure that its literal appli-

cation fulfills manifest congressional intent. *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *Dougherty v. Lehman,* 688 F.2d 158 (3d Cir.1982); *United States v. Perdue Farms, Inc.,* 680 F.2d 277 (2d Cir.1982); *PPG Industries, Inc. v. Harrison,* 660 F.2d 628 (5th Cir.1981).

■ Assuming, *arguendo,* that GMAC's phrase "credit references are insufficient" conveys substantially the same message as its regulatory counterpart, the notice provided in this case fails to satisfy the informative purposes of the ECOA. Upon receipt of GMAC's adverse determination letter, Fischl found himself in the dilemma described by one commentator:

The "insufficient credit references" reason has been severely criticized by rejected applicants because it fails to tell them how they can meet the creditor's requirements. The statement only raises the question of what "sufficient" is, and without further explanation, an applicant is left to speculate as to what will meet the creditor's standards.

Taylor, Meeting the Equal Opportunity Act's Specificity Requirement: Judgmental and Statistical Scoring Systems, 29 Buffalo L.Rev. 73, 90 (1980). *See generally* Reizenstein, A Fresh Look at the ECOA, 14 Akron L.Rev. 215 (1980). The Federal Trade Commission (FTC) and the Justice Department, both charged with administrative enforcement responsibilities under the ECOA, 15 U.S.C. §§ 1691c and 1691e(h), have strictly construed § 1691(d)(3)'s command in relation to several of the suggested reasons propounded in the Board's sample checklist. R. Clontz, Equal Credit Opportunity Manual at 5–24 (1983 Supp.). Use of such generic descriptive terms as "insufficient credit references" or "insufficient credit file" are not sanctioned by these governmental entities absent an explanation by the creditor of the manner in which the credit reference or file was insufficient. *Id. See, e.g., United States of America v. Montgomery Ward & Co.,* [1980 Transfer Binder] Consumer Credit Guide (CCH) ¶ 97,732 (D.D.C. May 29, 1979) (consent judgment obtained by Justice Department, enjoining Wards from using as the reason for adverse action such terms as "insufficient credit references" without stating specifically in what respect the credit references were insufficient).

Given that a combination of factors contributed to GMAC's adverse credit determination, the *reason articulated was misleading,* or at best excessively vague. *See Car-*

*roll v. Exxon Co., U.S.A.,* 434 F.Supp. 557 (E.D.La.1977). A GMAC employee acknowledged at trial that "many things can come under the definition of 'credit references are insufficient'." Being unaware of the creditor's minimum standards of creditworthiness, Fischl was unable to translate this reason into concrete criteria. He could neither improve his credit application, correct any misinformation in his credit record, or guard against discrimination, thus thwarting both the educational and protective objectives of the ECOA. GMAC's subsequent oral clarification of the factors which actually motivated its adverse decision did not remedy this omission. 15 U.S.C. 1691(d)(2)(A). Consistent with the Board's recent admonition that the protection of § 1691e(e) may not be invoked where factors delineated in the sample checklist are misleading by comparison to those actually weighed, or do not coincide with those in fact relied upon, *see* 12 C.F.R. § 202.901(f), we conclude that GMAC's conduct fell squarely within that proscribed by § 1691(d) and Regulation B.

■ Having found there was no liability, the district court did not evaluate Fischl's entitlement, under § 1691e, to actual damages, punitive damages or attorney's fees. When addressing this question on remand, the court is reminded that actual damages may include out-of-pocket monetary losses, injury to credit reputation and mental anguish, humiliation or embarrassment. *Anderson v. United Finance Co.,* 666 F.2d 1274 (9th Cir.1982); *Owens v. Magee Finance Serv. of Bogalusa, Inc.,* 476 F.Supp. 758 (E.D.La.1979). Punitive damages may be awarded pursuant to § 1691e(b), regardless of proof of actual damages, if the creditor's conduct is adjudged wanton, malicious or oppressive, or if it is deemed to have acted in reckless disregard of the applicable law. *Anderson; Shuman v. Standard Oil Co.,* 453 F.Supp. 1150 (N.D.Cal.1978) (*dicta*). *See Sayers v. General Motors Acceptance Corp.,* 522 F.Supp. 835 (W.D.Mo.1981); *Cherry v. Amoco Oil Co.,* 490 F.Supp. 1026 (N.D.Ga.1980). Finally, attorney's fees are available if an award of actual or punitive damages is made. 15 U.S.C. § 1691e(d).

*Fair Credit Reporting Act*

Fischl next argues that the district court erred in finding, first, that credit was not denied in whole or part on the basis of information contained in the consumer report issued by Credit Bureau Services, within the meaning of 15 U.S.C. § 1681m(a) and, second, that GMAC's oral disclosure of the name and address of the agency in response to Fischl's inquiry complied with the statute. Credit was not refused, in the district court's estimation, "because of information *in* the report; nothing adverse was there . . . . [rather, Fischl] was denied credit, in a sense, for what was *not* in the report: there was not sufficient evidence . . . of his ability to sustain high monthly payments." (emphasis by the trial court.)

Section 1681m(a)'s disclosure requirement is triggered "[w]henever credit . . . for personal . . . purposes . . . is denied . . . either wholly or partly because of information contained in the consumer report from a consumer reporting agency . . . ." In this situation, "the user [a lender or other creditor, insurance company, firm or employer] of the consumer report shall so advise the consumer against whom such adverse action has been taken and supply the name and address of the consumer reporting agency making the report." *Id. See Wood v. Holiday Inns, Inc.,* 508 F.2d 167 (5th Cir.1975). The purpose of the notification provision is to enable the subject of a consumer report to request disclosure from the reporting agency of the nature and scope of the information in his file.

Disclosure is not conditioned upon the creditor's consideration of derogatory or negative information in a consumer report in arriving at an adverse decision, so long as that decision is attributable wholly or in part to information in the report. FTC Pamphlet, Compliance With the Fair Credit Reporting Act at 38 (rev'd ed. 1979).[4] *See* R. Clontz, Fair Credit Reporting Manual at 5–3 (1977 ed.). *See also Carroll v. Exxon Co., U.S.A.* (where denial of credit not premised on adverse information in consumer report, but on credit bureau's inability to furnish definitive information regarding applicant's credit, § 1681m(a)'s disclosure requirement deemed controlling). According to an unofficial staff interpretation released by the FTC:

> Section 615 of the Fair Credit Reporting Act [15 U.S.C. § 1681m] makes no distinction between derogatory or favorable information in a consumer report

4. An interpretative guideline published by the FTC, the agency primarily responsible for enforcing the FCRA, recites in relevant part:

> The information need not be derogatory to constitute a consumer report [within the purview of the FCRA]. Any information, good or bad, written or oral, that bears on a consumer's credit worthiness, credit standing, credit capacity, character . . . will be a consumer report if it is:
>
> (a) Used or expected to be used, or
> (b) Collected in whole or in part
>
> for the purpose of considering the consumer's eligibility for consumer credit, insurance, employment, or other authorized business purpose.

FTC Pamphlet, Compliance with the Fair Credit Reporting Act at 2 (rev'd ed. 1979).

Although it does not possess substantive rule-making power, the FTC is authorized to enforce the FCRA, "except to the extent that enforcement . . . is specifically committed to some other government agency under [§ 1681s(b)] . . . ." 15 U.S.C. § 1681s(a). Accordingly, the FTC may invoke its cease-and-desist power, and any other enforcement mechanisms created by Congress pursuant to the Federal Trade Commission Act, as amended, 15 U.S.C. §§ 41–58, to enforce the FCRA. The Commission may exercise limited rule-making power by promulgating procedural rules to ensure compliance with the FCRA. 15 U.S.C. 1681s(a). Due to the absence of express statutory authority to issue binding interpretations of the FCRA, which effectively deprives any such interpretation of the force of law, opinions disseminated by the FTC, whether in the form of its compliance manual or unofficial staff letters, are intended only to clarify the FCRA and are advisory in nature. These opinions may nonetheless offer helpful guidance to the courts. *Watts v. Key Dodge Sales, Inc.,* 707 F.2d 847 (5th Cir.1983.) Compare R. Clontz, Fair Credit Reporting Act Manual at 1–1 to 1–2 (1982 Supp.) (postulating that Supreme Court's deferential treatment of Federal Reserve Board's power to enact interpretive rules in *Ford Motor Co. v. Milhollin,* 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), a case brought under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.,* will justify similar treatment of FTC interpretations of the FCRA, despite the Commission's lack of substantive rule-making authority).

which is used as a basis for denial of credit. Furthermore, the definition of a consumer report [set forth in § 1681a(d)] is not limited to derogatory or adverse information, [but encompasses] a communication of *any* information by a consumer reporting agency relating to a consumer's *credit worthiness, credit standing, credit capacity,* etc.

FTC Unofficial Staff Interpretation (July 5, 1973), *reprinted in* R. Clontz, Fair Credit Reporting Manual at E–100 (1977 ed.) (emphasis in the original). Thus a creditor could, upon obtaining a consumer report, discover that a prospective borrower had established an excellent credit record over a period of years, yet determine that qualifications revealed in the report did not meet its own standards of creditworthiness. Under these circumstances, disclosure would be mandated.

■ Such is the case herein. Fischl's application for credit was denied in part because of information in a report prepared by a credit reporting service. This information was incomplete and misleading. The

details of his credit history set forth in the report, when evaluated under GMAC's judgmental criteria, did not furnish a sufficient guarantee of financial responsibility to support an extension of credit in the amount sought. GMAC concluded that the record of Fischl's current obligations did not justify a prediction that he could successfully undertake the monthly payments contemplated.

Despite its reliance on data contained in the credit report, when reporting to Fischl via the form letter of October 3, 1980, GMAC did not disclose this information, advising instead that disclosure was inapplicable. This action did not comport with § 1681m(a). Similarly, GMAC's subsequent oral response to Fischl's inquiry, noting the name and address of the credit bureau, did not suffice under the statute. We need not and do not decide whether the notice required by § 1681m(a) must be written, nor do we decide the mandated timing for the notice. Those questions remain for another day.[5]

**5.** We note in passing, references reflecting congressional intent with respect to timing:

> The House amendment, which was agreed to by the conferees, deleted the requirement in § 615(a) [1681m(a)] that the consumer be required to submit a written request after denial of credit, insurance, or employment to obtain the name and address of the consumer reporting agency making the report. The conference substitute now requires the user of the report to convey this information to the consumer *immediately upon denial of credit,* insurance or employment.

Conf.Rep. No. 91–1587, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin. News, pp. 4394, 4416 (emphasis added). In the course of her presentation of the conference bill to the House, Representative Sullivan commented:

> The House conferees succeeded in *assuring immediate notification* to any individual, who is rejected for credit, insurance or employment because of information in a credit report, of the name and address of the agency which made the report on him. Thus, his right to access to his file is made more meaningful—he will *automatically* be told where to look for information which may be causing him needless harm. The Senate Bill would have required the consumer who had been rejected for credit, insurance, or employment because of ... information in a credit file to

request, in writing, the name and address of the credit reporting bureau, in order to check further into the information which may have caused his rejection. It was our feeling that this was a needless technicality which would have resulted, from a practical standpoint, in some, or many, individuals, for timidity or other reasons, failing to exercise their rights to find out where to go in order to have a damaging credit report reevaluated and, if wrong, corrected. Some of the consumer witnesses at our hearings made a particular point of this.

H.R. 15073, 91st Cong., 2d Sess., 116 Cong.Rec. 36571 (1970) (emphasis added).

One court, after examining the statutory language and pertinent legislative history, opined that disclosure under § 1681m(a) must be effected contemporaneously with the creditor's notification of its decision to decline credit. *Carroll v. Exxon Co., U.S.A.* This position finds support in advisory guidelines compiled by the FTC. FTC Pamphlet, Compliance with the Fair Credit Reporting Act at 3 (rev'd. ed. 1979) ("[t]he consumer is given the right to be told the name and address of the consumer reporting agency when he is rejected for credit, insurance or employment *at the time of such denial* ....") (emphasis added). *Accord,* R. Clontz, Equal Credit Opportunity Manual at 5–19 (1983 Supp.); Weinstein, Federal Fair Credit Reporting Act—Compliance By Lenders

■■ Because Fischl succeeded in locating the credit bureau and securing a copy of the report in short order, the district court determined that he could not have suffered any actual damages. That does not end the inquiry before us. Even where no pecuniary or out-of-pocket loss has been shown, the FCRA permits recovery for humiliation and mental distress, *Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509 (5th Cir.1982); *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829 (8th Cir.1976); *see Evers v. Equifax,* 650 F.2d 793 (5th Cir. 1981), as well as for injury to one's reputation and creditworthiness. *Bryant v. TRW, Inc.,* 689 F.2d 72 (6th Cir.1982) (*citing* Representative Sullivan's remarks, set forth at 116 Cong.Rec. 36570 (1970)). Negligent noncompliance with the FCRA entitles the consumer to an award of actual damages and reasonable attorney's fees, 15 U.S.C. § 1681 *o*; willful noncompliance in addition gives rise to liability for punitive damages. Section 1681n(2). *See Bryant v. TRW; Thornton v. Equifax,* 619 F.2d 700 (8th Cir.), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). Malice or evil motive need not be established for a punitive damages award, but the violation must have been willful. *Thornton.* On remand, the district court should assess plaintiff's right under §§ 1681*o* and 1681n to actual damages, costs and reasonable attorney's fees, and punitive damages. In so remanding, we intimate no conclusion as to whether damages should be awarded. That is for the district court to determine, either on the basis of the record as presently constituted or as supplemented by additional submissions, as the district court deems appropriate.

REVERSED and REMANDED for further proceedings consistent herewith.